Thomas M. Melton (Bar No. # 4999)
Karen L. Martinez (Bar No. # 7914)
Tanya G. Beard (Bar No. #9106)
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
15 W. South Temple, Suite 1800
Salt Lake City, UT  84101
(801) 524-5796

FILED
U.S. DISTRICT COURT

2007 DEC 17 P 3: 42

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                          Plaintiff,

           v.

MICHAEL K. OPENSHAW,

                          Defendant.

CIVIL NO:

COMPLAINT

Case: 2:07cv00977
Assigned To : Warner, Paul M.
Assign. Date : 12/17/2007
Description: Securities and Exchange
Commission v. Openshaw

Plaintiff, Securities and Exhange Commission ("Commission") for its complaint against

defendant Michael K. Openshaw ("Openshaw" or "Defendant"), alleges as follows:

1.     Openshaw violated the federal securities laws while serving as Chief Financial Officer

       of Q Comm International, Inc. by wiring $1,525,000 of corporate funds without

       authorization and by concealing the wires with fraudulent accounting transactions and

       by falsifying documents.

2.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of

       the Exchange Act [15 U.S.C. §§ 78u(d), §§ 78u(e) and 78aa].

3.      Openshaw, directly or indirectly, has made use of the mails, means or instruments of

transportation or communication in interstate commerce, or means or instrumentalities

of interstate commerce in connection with the transactions, acts, practices and courses

of business described in this Complaint.

4.      Venue over this action is proper pursuant to Section 27 of the Exchange Act [15

U.S.C. § 78aa].

5.      Certain of the transactions, acts, practices, and courses of business constituting

violations alleged herein occurred within the state of Utah.  Openshaw resides and may

be found within the District of Utah.

### SUMMARY

6.      These proceedings arise out of a series of unauthorized acts Openshaw committed

while he served as Chief Financial Officer ("CFO") of Q Comm International, Inc. ("Q

Comm") from April 2001 through May 2005.

7.      Q Comm is a Utah corporation based in Orem, Utah.  Q Comm is in the business of

purchasing and reselling prepaid telecommunication products and services, primarily

prepaid wireless telephone talk time and prepaid long distance minutes.  In general,

these prepaid products are sold in the form of a personal identification number, or

"PIN."  Q Comm purchases PINs from telecommunications carriers and distributes

them through a network of retail outlets.  Q Comm stock was registered with the

Commission under Section 12(b) of the Exchange Act on January 13, 2000, and has

been so registered at all times relevant to this proceeding.

8.      From September through December of 2004, Openshaw completed five unauthorized

bank wires, transferring a total of $1,525,000 of Q Comm's funds to a Q Comm

vendor. Openshaw wired these funds without approval and without disclosing the transfers to other members of Q Comm's management or its auditors.

9.      Openshaw concealed the transfers from Q Comm and its auditors for nearly nine months by mischaracterizing them in improper accounting entries and by altering documents.

10.     At the end of May 2005, Openshaw voluntarily resigned from Q Comm. In June 2005, Q Comm discovered the unauthorized transfers, improper accounting entries and a bank statement that Openshaw had altered.

11.     Q Comm was unable to recover a significant portion of the $1,525,000 Openshaw had transferred and Openshaw's acts caused Q Comm's financial statements for the year ended December 31, 2004 and for the quarter ended March 31, 2005 to be materially misleading and to deviate from Generally Accepted Accounting Principles ("GAAP").

## STATUTES AND RULES ALLEGED TO HAVE BEEN VIOLATED

12.     Openshaw has engaged in and, unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business which constitute violations of Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder, and aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(a), 78m(b)(2)(A), and 78m(b)(2)(B) and Rules 12b-20, 13a-1, and 13a-13, and thereunder.

13.     Openshaw's conduct occurred in connection with the purchase or sale of Q Comm's securities.

**DEFENDANT**

14.   Openshaw, age 48, became a certified public accountant licensed to practice in the state of Utah in 1984. Openshaw's CPA license expired on September 30, 1996. Openshaw is a resident of Draper, Utah.

**BACKGROUND**

15.   Openshaw was Q Comm's CFO from April 1, 2001, until May 31, 2005. In addition to his managerial responsibilities, Openshaw was involved in all of Q Comm's PIN orders and wire transfers. When placing PIN orders, Q Comm's internal controls required that its purchasing manager prepare all order forms and that Openshaw review and approve them. For wire transfers, Q Comm's internal controls mandated that its accounting manager prepare all wire transfer forms and that Openshaw review and approve them.

16.   In February 2004, Openshaw approved a PIN purchase order of approximately $300,000 from a new vendor ("Vendor"). Most of these PINs were expired or were otherwise unusable and Q Comm could not sell them. Openshaw had numerous discussions with the Vendor regarding how to compensate Q Comm for the loss it incurred. The Vendor acknowledged a duty to reimburse Q Comm for these PINs; however, the Vendor lacked the funds to do so.

17.   Openshaw did not discuss the approximate $300,000 loss with Q Comm's CEO.

18.   From February 2004 until September 2004, Openshaw had regular discussions with the Vendor regarding how the Vendor would compensate Q Comm for its $300,000 loss.

19.    In September 2004, the Vendor approached Openshaw with a proposal, asking

Openshaw to participate in a transaction involving the purchase and sale of 70,000

cellular phones.  The Vendor told Openshaw that if Q Comm funded the purchase of

these cellular phones (since the Vendor lacked the funds to do so) the Vendor could

sell them at a profit sufficient to repay Q Comm its deposit and the $300,000 it owed

Q Comm for the unusable PINs.

### OPENSHAW WIRED $1,525,000 OF Q COMM'S FUNDS WITHOUT AUTHORIZATION

20.    Openshaw knew that Q Comm's CEO would have rejected the Vendor's proposal

since the CEO had previously opposed any involvement in the business of cellular

phones.  The CEO had openly expressed his opinion that cellular phones were more

susceptible to fashion trends than PINs and therefore presented a risk that Q Comm

should not take.  Despite knowing this, Openshaw agreed to the Vendor's proposal

and began using Q Comm's funds to help the Vendor purchase the cellular phones.

Openshaw never discussed the agreement with other members of Q Comm's

management and the agreement was never reduced to writing.

21.    From September 2004 through December 2004, Openshaw unilaterally completed a

total of five bank wires totaling $1,525,000 as a deposit on the cellular phones.  These

wires were as follows:  on September 21, 2004, Openshaw completed two wire

transfers of $300,000 each; on October 1, 2004 he wired $325,000; on November 2,

2004 he wired $500,000; and on December 7, 2004 he wired $100,000.

22.    Openshaw concealed the bank wires by mischaracterizing the $1,525,000 in Q

Comm's accounting records, using categories such as "Miscellaneous Receivables,"

"PIN orders," and "In-transit Inventory" instead of reflecting that the funds were a deposit for cellular phones.

23.     Openshaw was able to complete these unauthorized wires and conceal them from the company in part because Q Comm's system of internal accounting controls was inadequate to prevent, or to timely detect, the improper transfers or the inaccurate accounting entries.

24.     Although Q Comm's internal controls required that its accounting manager prepare all wire transfer forms for Openshaw's approval, Q Comm had terminated its accounting manager in early September 2004 and did not hire a replacement until after December 7, 2004, when the last wire transfer took place.  Since Q Comm did not assign the duty of preparing wire transfer request forms to another employee, Openshaw was able to prepare and sign all five wire transfers without the knowledge or approval of anyone else at Q Comm.

25.     Further, Q Comm's accounting system did not provide an audit trail, which allowed Openshaw to change accounting entries without detection.  Finally, although Q Comm's written internal controls require that its CEO review all checks and wire transfers exceeding $500.00, Openshaw was able to transfer the $1,525,000 and falsely record it as money spent to purchase PINs without Q Comm's CEO discovering the problem.

## OPENSHAW ALTERED Q COMM'S BANK STATEMENT TO CONCEAL HIS ACTS

26.     Since Openshaw and the Vendor did not have a written contract detailing the terms of their agreement, Openshaw asked the Vendor to send him checks totaling $1,525,000,

payable to Q Comm, as evidence that the Vendor owed Q Comm this amount. The checks from the Vendor were as follows: (1) a $600,000 check dated September 29, 2004; (2) a $325,000 check also dated September 29, 2004; and (3) a $600,000 check dated December 31, 2004. Although the Vendor lacked the funds to cover these checks, Openshaw assured the Vendor, in writing, that he would not deposit the checks until the Vendor had sufficient funds to cover the checks.

27.     On December 31, 2004, the last day of Q Comm's fiscal year, Openshaw deposited two of the Vendor's checks, totaling $925,000, despite knowing that these checks would not clear on that day. The effect of this was to conceal the unauthorized transfers from Q Comm's management and auditors. These checks were recorded on Q Comm's books as a debit to the bank account and a credit to miscellaneous receivables.

28.     When Openshaw indicated that he intended to deposit the checks, the Vendor asked his bank to stop payment on the two checks.

29.     Openshaw recorded the third check, in the amount of $600,000, as "funds received but not deposited," crediting miscellaneous receivables, which removed the remaining false balance in that account.

30.     Prior to Q Comm's filing of its Form 10-KSB for the year ended December 31, 2004, the auditors determined to move the $600,000 from "funds received but not deposited," to accounts receivable, because Openshaw led them to believe it represented additional funds due from the Vendor. The auditors also requested that Q Comm set up a reserve and charge the $600,000 to bad debt expense to reflect the auditors' determination that the funds were unlikely to be collected. Inclusion of this

expense, which resulted from Openshaw's actions, increased Q Comm's net loss for that year by more than 10%.

31.    On January 6, 2005, the $925,000 deposit was deducted from Q Comm's account by the bank because the Vendor had stopped payment on the checks. The January bank statement described the deduction as a "Deposited Item Returned." Openshaw obtained this statement and altered it in order to continue to conceal his actions described above from management and the auditors. He typed a new description of "Wire Transfer Out" and taped it over the actual description. This altered statement was provided to Q Comm's auditors as part of Q Comm's books and records.

32.    Openshaw then caused accounting entries to be made that falsely indicated a wire transfer from one bank account to another had taken place. By altering the bank statement and causing a nonexistent transaction to be recorded, Openshaw created a material overstatement of $925,000 in Q Comm's cash in bank at December 31, 2004, and concealed his actions.

33.    During the quarter ended March 31, 2005, Openshaw made additional journal entries which falsely reflected that $550,000 was moved from Q Comm's bank account to inventory and then from inventory to prepaid expenses. This had the effect of materially overstating the balance in the prepaid expense account by $550,000, and left a material overstatement in the bank of $375,000 on Q Comm's financial statements filed with the Commission in its Form 10-Q for the quarter ended March 31, 2005.

34.    Thus, Openshaw's acts caused Q Comm's financial statements to materially mischaracterize its assets in both its year ended 2004 and quarter ended March 31, 2005 financial statements.

## Q COMM DISCOVERED OPENSHAW'S FRAUD

35.   In late May 2005, Openshaw resigned from Q Comm.  In June 2005, Q Comm's

management discovered the unauthorized wires and questioned Openshaw about the

matters referred to above.  On June 22, 2005, Q Comm filed a Form 8-K, stating that

Openshaw acted without authorization in advancing $1,525,000 to a supplier.  Q

Comm also retained an outside accounting firm to investigate the accounting and

financial irregularities tied to this transfer of funds.

36.   On August 10, 2005, Q Comm restated its consolidated financial statements for the

year ended December 31, 2004 in an amended Form 10-KSB and reclassified the

$925,000 from cash in bank to a deposit to the Vendor, and reclassified the $600,000

from bad debt expense, included in general and administrative expense, to cost of

goods sold.  On August 11, 2005, Q Comm restated its Form 10-QSB for the quarter

ended March 31, 2005, reclassifying the $375,000 from cash in bank to a deposit to

the Vendor, and writing off $285,005 as the remaining loss anticipated from the

transactions described herein.  These changes increased the company's net loss for the

quarter by 22%, or 6¢ a share.

## FIRST CAUSE OF ACTION

**FRAUD IN CONNECTION WITH THE PURCHASE AND SALE OF SECURITIES**
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5**
**thereunder [17 C.F.R. § 240.10b-5]**

9

37.   Plaintiff Commission repeats and realleges the paragraphs above as though fully set forth herein.

38.   Defendant Openshaw, by engaging in the conduct described above, directly or indirectly, in connection with the purchase and sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, with scienter: (1) employed devices, schemes or artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

39.   By reason of the foregoing, defendant Openshaw, directly or indirectly, violated and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].


## SECOND CAUSE OF ACTION

**KNOWING FALSIFICATION OF BOOKS AND RECORDS AND CIRCUMVENTION OF SYSTEM OF INTERNAL CONTROLS**
**Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]**

40.   Plaintiff Commission repeats and realleges the paragraphs above as though fully set forth herein.

41.   Openshaw knowingly falsified Q Comm's books and records and knowingly circumvented Q Comm's system of internal controls.

42.   Openshaw circumvented Q Comm's internal controls by unilaterally wiring $1,525,000 of Q Comm's funds without authorization.  Openshaw ignored Q

Comm's internal control requirement that an Accounting Manager prepare all wire forms for the CFO's review and instead, Openshaw prepared these forms himself. Openshaw also knowingly falsified Q Comm's books and records by entering false and misleading accounting enties and altering Q Comm's January 2005 bank statement to conceal his unauthorized wires from other members of Q Comm's management and its auditors.

43.     By reason of the foregoing, Openshaw, directly or indirectly, violated and unless restrained and enjoined, will continue to violate Section 13(b)(5) of the Exchange Act.

## THIRD CAUSE OF ACTION

### FALSE CERTIFICATION OF AN ANNUAL REPORT
### Violations of Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14]

44.     Plaintiff Commission repeats and realleges the paragraphs above as though fully set forth herein.

45.     Q Comm's Form 10-KSB for the year ended December 31, 2004 overstated the amount of cash by $925,000 and failed to properly account for the deposit that Openshaw had wired to Q Comm's vendor.

46.     Openshaw certified Q Comm's Form 10-KSB for the year ended December 31, 2004.

47.     As set forth above, Openshaw knew that Q Comm's financial statements included in the From 10-KSB for the year ended December 31, 2004, contained materially false and materially misleading information and transactions that were recorded in violation of GAAP.

11

48.    By reason of the foregoing, Openshaw, directly or indirectly, violated and unless restrained and enjoined, will continue to violate Rule 13a-14 of the Exchange Act.

## FOURTH CAUSE OF ACTION

### FALSIFICATION OF BOOKS AND RECORDS
### Violation of Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1]

49.    Plaintiff Commission repeats and realleges the paragraphs above as though fully set forth herein.

50.    Q Comm was required to maintain and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of assets.  Rule 13b2-1 requires that a company's books and records not be falsified by any person.

51.    Openshaw falsified Q Comm's books, records and accounts by mischaracterizing accounting entries and altering Q Comm's January 2005 bank statement in order to conceal his unauthorized bank wires.

52.    By reason of the foregoing, Openshaw, directly or indirectly, violated and unless retrained and enjoined will continue to violate Rule 13b2-1 under the Exchange Act.

## FIFTH CAUSE OF ACTION

### PROVIDING FALSE AND MISLEADING INFORMATION TO ACCOUNTANTS Violations of Rule13b2-2 under the Exchange Act [17 C.F.R. § 240.13b2-2]

53.    Plaintiff Commission repeats and realleges the paragraphs above as though fully set forth herein.

54.    Openshaw, directly or indirectly, made and caused to be made materially false and misleading statements, and omitted to state and caused other persons to omit to state,

12

material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to accountants in connection with the audit of Q Comm's financial statements for the fiscal year ended December 31, 2004 and in connection with the review of its financial statements for the quarter ended March 31, 2005.

55. Openshaw did not disclose to Q Comm's auditors that he had competed five unauthorized wires, transferring a total of $1,525,000 to a vendor.

56. Openshaw entered false and mischaraterizing accounting entries and provided them to Q Comm's auditors as part of Q Comm's books and records in order to mislead Q Comm's auditors in connection with the year ended 2004 audit.

57. Openshaw physically altered Q Comm's January 2005 bank statement and provided it to Q Comm's auditors as part of Q Comm's books and records in order to mislead them into recognizing cash in Q Comm's bank account that Openshaw knew did not exist.

58. By his conduct, Openshaw caused Q Comm's books and records to improperly reflect the deposit Openshaw had made with its Vendor and to overstate Q Comm's cash in bank.

59. By reason of the foregoing, Openshaw, directly or indirectly, violated and unless restrained and enjoined will continue to violate Rule 13b2-2 under the Exchange Act.

## SIXTH CAUSE OF ACTION

### AIDING AND ABETTING BOOKS AND RECORDS VIOLATIONS, FALSE FILINGS WITH THE COMMISSION, AND INTERNAL CONTROL VIOLATIONS

**Aiding and Abetting Violations of Section 13(a) and 13(b)(2)(A) and (B) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A) and (B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. 240.12b-20, 240.13a-1, and 240.13a-13]**

60. Plaintiff Commission repeats and realleges the paragraphs above as though fully set forth herein.

61. Section 13(a) and Rules 12b-20, 13a-1 and 13a-13 require companies filing periodic reports with the Commission to file truthful reports that do not omit material information that would otherwise make the information in the filings not misleading.

62. Q Comm violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder by filing materially misleading financial statements in its reports for the year ended December 31, 2004 and the quarter ended March 31, 2005.

63. Q Comm violated Section 13(b)(2)(A) of the Exchange Act by not keeping accurate accounting books, records, and accounts, by not fairly reflecting the transaction Openshaw entered into with the Vendor in its accounting records, and by accurately reflecting Q Comm's disposition of its assets in its financial statements for the year ended December 31, 2004 and for the quarter ended March 31, 2005.

64. Q Comm violated Section 13(b)(2)(B) of the Exchange Act by not devising and maintaining a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements and to maintain accountability for such assets.

65. Openshaw was generally aware that his role in Q Comm's violations of Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 were improper.

66. Openshaw knowingly and substantially assisted Q Comm in violating Sections 13(a) and 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 by competing five unauthorized wires transferring $1,525,000 to a vendor, by creating false and mischaraterizing accounting entries, and by physically altering Q Comm's January 2005 bank statement to conceal his fraud.

67. By reason of the foregoing, Openshaw, directly or indirectly, aided and abetted, and unless restrained and enjoined will continue to aid and abet violations of Section 13(a) and 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the defendant committed the violations charged herein.

### II.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders temporarily restraining and preliminarily and permanently enjoining defendant Openshaw, and his officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts,

practices and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### III.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders temporarily restraining and preliminarily and permanently enjoining defendant Openshaw and his officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 13(b)(5) of the Exchange Act and Rules 13a-14, 13b2-1, and 13b2-2 thereunder.

### IV.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders temporarily restraining and preliminarily and permanently enjoining defendant Openshaw and his officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in the transactions, acts, practices and courses of business described herein, and from engaging in conduct of similar purport and object in aiding and abetting violations of Section 13(a) and 13(b)(2)(A) and (B) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### V.

16

Permanently bar defendant Openshaw from serving as an officer or director of any issuer
that has a class of securities registered pursuant to Section 12 of the Exchange Act, as
amended [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the
Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Enter an order directing defendant Openshaw to pay civil money penalties pursuant to
Section 21(d)(3) of the Exchange Act.

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the
Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders
and decrees that may be entered, or to entertain any suitable application or motion for
additional relief within the jurisdiction of this Court.

Dated this 13th day of December, 2007.

Thomas M. Melton
Karen L. Martinez
Tanya G. Beard
*Attorneys for Plaintiff*
SECURITIES AND EXCHANGE COMMISSION
Salt Lake District Office
15 W. South Temple, Suite 1800
Salt Lake City, UT 84101
(801) 524-5796

17